Allison<br><i>vs</i><br>Taylor's h's &c.

---

## Allison *vs* Taylor's heirs, and Taylor's heirs *vs* Allison.

### Error to the Louisville Chancery Court.

*Sale of land. Executions. Rescission of contracts. Ameliorations.*

Chief Justice Ewing delivered the opinion of the Court.

The heirs of Edmund H. Taylor filed their bill in November, 1839, against Allison, White, and Laugherty, to set aside a sale of a tract of land of their ancestor, made under color of four executions, which issued against him in his lifetime, or that they be permitted to redeem the same, upon refunding the consideration, with interest, or if that cannot be done, that the quantity sold be ascertained and laid off to the purchaser or his vendees, and that

Chancery.

Case 102.

May 3.

The object of the bill.

ALLISON
*vs*
TAYLOR'S H'S &C.

Grounds of Equity.

they have designated and set apart to them the surplus which the vendees claim under their pretended purchase.

An inquisition of lunacy was instituted against Edmund H. Taylor, in 1825, and he was found and declared to be a lunatic, and his son, son-in-law, and another were appointed his committee, and the two former took upon themselves the management of his estate. He continued a lunatic till his death, which took place in 1838.

The Transylvania University, being the owner of a large tract of land on Harrod's and Goose Creeks, on the Ohio, in Jefferson County, had the same laid off into lots of 100 acres each, and leased those lots to tenants, for a term of years. Wm. Kearny, as sub-lessee, became possessed of two of those lots, (No. 9 and No. 16,) for the term of twenty-six years, commencing on the 1st of November, 1800, by lease recorded in the Clerk's Office of the County of Jefferson. He resided on lot No. 16, and had a small improvement and old mill on lot No. 9. The two lots adjoin and are described in his lease as containing one hundred acres each, but upon accurate survey, it is ascertained that lot No. 16 contains 106¾ acres and lot No. 9 100¼ acres, and both together contain 207 acres. Lot No. 16 does not extend to Goose Creek. The S. E. corner points towards the Creek but does not extend to it by several poles. The North Fork of Goose Creek runs diagonally through lot No. 9, leaving about sixty acres on the north side, adjoining lot No. 16, the residue lies on the south side of the Creek. H. W. Allison and Samuel N. Luckett acquired the title in fee, from the University, to a part of their tract, lying on the North and West of Nos. 9 and 16, and Edmund H. Taylor acquired the title in fee to the residue, embracing said lots.

Three executions issued against Taylor, in 1831, upon judgments which had been recovered against him after he had been declared a lunatic, one bearing test the 13th December, 1831, which is returned as having been levied on the 20th of the same month, "on a certain tract or parcel of land lying between Harrod's Creek and Goose Creek, adjoining the lands of H. W. Allison, in Jefferson County, being the same tract formerly occupied by Wm. Kearny, containing, by estimation, one hundred

and forty acres, be the same more or less." The two other executions bear test the 21st December, 1831, and are returned as levied on the same tract, the time of the levy not stated.

The 2d of January, 1832, was fixed as the day of sale, at the door of the Court House, it being court day. No person attending on the part of the plaintiffs or defendant, to make choice of valuers, the Sheriff made selection and those selected valued the land and reported their valuation of the 140 acres, "at eleven dollars per acre, or $1540 for the 140 acres, 2d January, 1832."

On that day the Sheriff sold the land so levied on, "excepting one acre, to be laid off on that side of the tract nearest to Goose Creek," and Samuel Laugherty became the purchaser at $895 90, the full amount of the three executions and costs, at three months credit.

Another execution afterwards issued against Taylor, by virtue of which his right of redemption in the 139 acres, more or less, sold on the 2d of January, 1832, was sold on the 2d day of July, 1832, and Samuel Laugherty became the purchaser at $232 82, it being the full amount of this last execution.

The Sheriff afterwards, by deed reciting the aforesaid levies, valuation and sales, conveyed to Laugherty the land so sold, it being described to be "a certain tract or parcel of land belonging to Edmund H. Taylor, lying between Harrod's Creek and Goose Creek, adjoining the lands of H. W. Allison, in Jefferson County, it being the *whole* of the tract of land formerly occupied by Wm. Kearny, containing 140 acres, be the same more or less, less one acre, to be laid off on that side of the tract nearest to Goose Creek." Laugherty sold to Allison & White, and the latter afterwads sold his interest to Allison, who sued in ejectment the tenants of Taylor, and recovered judgment, and in 1839, was let into possession and is now in possession, *claiming title* to the whole of the said two lots of land, "less one acre," which one acre has not been laid off or assigned to the complainants below.

The Chancellor, upon the hearing, set aside the sales and cancelled the deed, upon the complainants refunding the consideration of the two purchases at the Sheriff's

The decree of the Chancellor, vacating the sales under ex'on, &c.

sale; with interest, within six months from the date of the decree, allowing no deduction therefrom for rents, and retained the cause to enforce the defendant's lien upon the land for the consideration and interest, in case it should not be paid.

The defendants have brought the case to this Court for revision, and the complainants have filed cross errors, assigning that the Court erred in refusing to allow them rents, to be deducted from the consideration and interest, which they are decreed to refund.

1. We cannot concur with the Chancellor that there was any irregularity in selling the land too soon after the levy. The levy of the first execution being made on the 20th of December, and the other two having come to the hands of the same Sheriff, on the 21st of December, and all being returned duly levied, it may be presumed that they were on the same day levied on the land which had the day before been levied on by virtue of the first execution, and was then in the custody of the Sheriff. Presuming then that the levy was made on the 21st of December, under the two.last executions, there was thirteen days from the levy under the first execution, and twelve days from the levy under the two last, before the day of sale, which was on the second day of the succeeding January.

The 13th Sec. of the Act of 1828, (1 *Stat. Law*, 639,) directs the Sheriff to make sale of land or slaves levied on, ''on the first day set apart by law for the sitting of the next ensuing Circuit or County Court, in that county in which the levy is made, in the court yard of said county,'' ''provided that such officer shall have previously advertised, &c.'' ''and when such advertisement shall not have been made for *ten days* then such sale shall not be made until the next succeeding court day, unless, &c.''

We understand by this clause that the Sheriff is not only authorized but required to sell lands and slaves levied on, on the first day of the next court, if sufficient time intervenes after the levy, to give *ten days* notice of the sale, and such notice has been given, and if not, that the sale is to be made on the first day of the following court.

The last clause of the 13th Sec. provides. that, as to all *other property* levied on, meaning, obviously, property

*[margin notes:]*

Sheriff having 2 executions ag'st the same defendant, returns that he levied them on a property, but does not specify the day of the levy of one, he will be presumed to have levied both in time for a sale, where the sale appeared to be made in proper time as to the execution, having a date to the levy.

Provisions of the Execution Law of 1828, respecting sales of land under execution, 13th Sec. (*Stat. Law*, 639.)

Sheriff to advertise land and slaves for ten days, and sell at the court house on a day set apart by law for holding Court.

—Other property to be advertised

other than land or slaves, shall be advertised for sale not less than ten nor more than fifteen days before the sale, "and that the sale thereof shall not take place until twenty days after the levy." But this restriction against the right to sell, short of twenty days after the levy, applies, doubtlessly, to property other than land or slaves, and not to land or slaves, the mode, time, and place of selling which, is provided for in the first clause of the section, which does not limit the time of sale to any prescribed period *after the levy*, but only to a prescribed time after notice.

*Allison*
*vs*
Taylor's h's &c.

between 10 & 15 days before sale, which shall not be sooner than 20 days from the levy of the execution, by the act of 1828, changed by that of 1829, (*Stat. Law*, 654.)

The act of 1829, (*Stat. Law*, 654,) repeals so much of the 13th Sec. before cited, "as requires that the sale shall not take place until twenty days after the levy, so far as relates to all property taken in execution, *except* land and negroes." Now as we have shown that the restriction upon the right to sell short of twenty days after the levy, in the thirteenth section, applied only to other property than lands and slaves, the repeal can be made to apply to and act upon this restriction only. As no such restriction is found in the section applicable to lands and slaves, the exception in the repealing clause, as to this kind of property, can have no effect or operation. It cannot be regarded as a substantive enactment prohibiting the sale of lands or slaves, short of twenty days after the levy, but as an attempt to save from repeal a former enactment which had no existence, and which attempt cannot be construed to have the effect to change, in any respect, the former enactment in relation to the manner, time, or place of sale of this description of property.

2. Nor do we think that the heirs, by reason of the lunacy of their ancestor, can be indulged in the legal right to redeem the land sold, (it being sold for less than two thirds of its value,) after the twelve months has expired, prescribed by the *statute*, or upon other or different terms than those prescribed for all others. There is no saving in the statute in favor of lunatics, infants, idiots, or others laboring under disabilities. By the sale and conveyance the legal title in fee passes, and it can only be divested by a strict compliance with the terms, and within the time prescribed by the statute, (1 *Stat. Law*, 650.)

There is no saving for the benefit of idiots, lunatics or *infants* in the statute of 1828, permitting the redemption of land sold under execution.

The Chancellor watches over the interest of *infants* with a scrupulous care and vigilance, and in cases of fraud or mistake, though a court of law might act, yet will the Chancellor where the Court of law does not.

3. But though lunatics have no legal right to redeem, upon other or different terms than others, and Courts of Equity, upon the single ground of lunacy, would not be authorized to alter or add to the law, or prescribe and allow to them or their heirs, other and more favorable terms than those prescribed by the statute, (for that would be to indulge the Chancellor in riding over an express legislative enactment;) yet lunatics, infants, and persons laboring under disabilities, are, by reason of their helpless condition, the favorites of Courts of Equity, and their helplessness and inability to take care of their own interest, and guard against frauds, impositions, and injuries, will induce the Chancellor to look into a transaction by which they have been deprived of their estate, with more scrupulous care and watchful vigilance, and will induce him, upon slighter grounds of mistake, irregularity, or fraud, to interpose in their behalf, and allow a redemption upon equitable terms, when, by reason of such mistake, irregularity, or fraud, it is rendered reasonably probable, that their estate may have been sold at a sacrifice. And though a Court of law has jurisdiction and control over the process issuing from its own Court, and may, upon motion, correct any irregularities which may occur in the execution of the same, yet it is well settled that for fraud, mistake, or any cause which would justify the interposition of the Chancellor, in the case of private sales, will he take jurisdiction in the case of public sales made under color of legal process: *Blight's heirs* vs *Tobin*, (7 *Monroe*, 615;) *Woolfolk* vs *Phelps, et al.* (2 *J. J. Marshall*, 32;) *Gist* vs *Frazer and Stewart.*

When a less number of acres than the whole tract of land levied on by execution sells for the amount of the execution, and the Sheriff fails to designate off which side or end he sells, and fairly thus to ascertain who will pay the execution for the *least*

There is an obvious departure from the express provisions of the statute, and a glaring irregularity in the manner of sale in the case under consideration. The 27th Sec. of the act of 1828, (*Stat. Law*, 649,) prescribes the mode by which the *whole tract*, about to be exposed to sale, shall be valued. The 28th section provides, that "if the whole of the said tract, when exposed to sale, shall have been bid up to the amount of the execution or executions, under which it is sold, and all costs, then the officer selling the same *shall designate on which end or side* the purchaser shall have what he may buy *laid*

off to him, and shall then cry the same in such manner as to ascertain who will pay the debt and costs for the least *number of acres* or *portion* of land off of such *side* or *end*, to be laid off in *convenient form*." The 29th section provides, "that when less than the whole tract will satisfy the execution as above, the officer shall forthwith, after the sale, cause the part so sold to be valued, in the manner above pointed out, and endorse such *valuation*, with the other *facts* necessary to *explain* the same, upon the *execution* or some paper appendant thereto, and make return thereof as in other cases."

It appears in this case that less than the whole tract, designated and cried at 140 acres, was sufficient to pay the whole amount of the executions and costs, and less than the whole tract was sold by one acre. A case therefore occurred, in which it was the legal duty of the officer, explicitly prescribed by law, to pursue the manner and mode of sale prescribed by the foregoing sections. Yet he wholly failed to designate off of which *end* or *side* of the tract the purchaser should have what he might purchase, or to *cry* the same so as to ascertain who would pay the executions and costs for the *least number of acres*, to be taken off of the *end* or *side* so designated, and laid off in *convenient form*, or to procure a valuation after the sale of the part so designated and sold. Instead of pursuing these plainly prescribed directions of the statute, he cried and sold one hundred and forty acres, *more* or *less*, "less one acre, to be laid off on that side of the tract nearest to Goose Creek."

Now if it be contended that the designation of the location of the one acre is tantamount to, and in effect a designation of the residue, as the land sold, and that such designation amounts substantially to a designation of the number of acres sold, and on what *end* or *side* the same lies. We insist that there is a very essential difference, and that difference operates to the injury of the lunatic. Had the *number of acres* sold been designated to be laid off on a side or end of the tract, then would the surplus have been left to the lunatic and his heirs, instead of being made to go to the purchaser and to increase his purchase to some sixty odd acres more than he or other

ALLISON
*vs*
TAYLOR'S H'S &c.

*number of acres*, to be taken off as designated, or to procure a *valuation* of the part so sold—but selling the whole tract, more or less, "less one acre, to be laid off next to Goose Creek," the sale is irregular and illegal.

bidders could have expected to acquire by the manner in which the land was cried, if he gets both lots which he claims. Besides, if he gets the surplus, by the words more or less, adopted in the sale and conveyance, there was more land sold than was necessary to satisfy the executions and costs, and it may be well questioned whether the officer has not exceeded his authority, and whether the sale is not rendered void on that ground.

If it is not, then may the officer, by the designation of a quantity of acres in the tract, much under the true quantity, and the use of the terms "more or less," accomplish that which would unquestionably render his sale void, if done directly. But whether rendered absolutely void or not, if 140 acres, "less one acre," or 139 acres, would command the whole amount of the executions and costs, it must be believed that 207 acres, "less one," would have commanded much more than the whole amount.

But again, where is the one acre to be located? If that is uncertain, the precise land sold is rendered equally uncertain. It is "to be laid off on that side of the tract nearest to Goose Creek." Goose Creek runs diagonally through one of the lots, bisecting it nearly in equal halves. Shall the acre be laid off in a square on the creek? If so, shall it be laid at the upper or lower end of the tract, or in the centre, on the creek, or shall it be stretched along in a string on the creek and parallel to it, from the upper to the lower side of the lot? If either mode be adopted, and it is impossible to tell which was intended, it will not be taken off either side or end of the tract, but nearly out of the centre of one of the lots, and leaves the residue not as it is required to be sold and laid off by the statute, on some *end* or *side* of the tract, in convenient shape, but in two parcels, separated from each other by the acre which is unsold. It is impossible to believe otherwise than that a sale made in this manner must have had an injurious effect upon the price, if known to the bidders.

But the uncertainty, doubt and difficulty, as to the location, as well as quantity of the land sold, does not stop here. The land levied on and sold is described as "lying between Goose Creek and Harrod's Creek, adjoining

the lands of H. W. Allison, being the same tract formerly occupied by Wm. Kearny, containing 140 acres, more or less." Kearny's lease embraced two lots of 100 acres each, designated by Nos. 9 and 16, and bounded and abutted by well defined marks and boundaries, one of which lots, upon re-survey, contains 100¼, the other 106¾. Kearny resided upon lot No. 16, and had a small field and old mill on the other. Either of the lots, taken separately, falls short of the quantity called for in the levy and sale, the one by near forty acres, the other by near thirty-four, and both together exceed the quantity by sixty-seven acres. Which was intended? He *resided* upon the one which fell short of the quantity near 34 acres, and it may be that the tract upon which was his residence, was intended to be described as the land formerly *occupied* by Wm. Kearny. Yet he possessed, cultivated and used the adjoining tract, and may appropriately be said to have occupied it also. Some of the witnesses speak of the tract upon which he resided as his known occupancy; others speak of the two lots as being the land occupied by him, and say they never knew that they were laid off into separate lots.

The land levied on and sold is described as lying between Harrod's Creek and Goose Creek, nearly one half of lot No. 9 lies on the opposite side of the northern fork of Goose Creek, and between the northern and southern fork. It calls for "adjoining the lands of H. W. Allison." Each and both lots adjoin Allison, consequently, this general description will apply to either or both of the lots. So we are left in uncertainty and doubt, from the quantity, description and location given to the land, whether one or both lots were sold or intended to be sold. And all this uncertainty, doubt and difficulty, has been produced by a total disregard of the plain directions of the statute in the sale.

Nor can Laugherty, the purchaser, or his vendees, escape from the consequences of the alledged irregularity. They must be presumed to know the law, and knowing it, Laugherty should have known that the sale was illegal and unauthorized in the manner it was made. And as all the steps taken, and the mode of sale is to be found

in the returns of the officer, and on the face of the deed through which his vendees derive their title, they also had notice, and can stand in no better condition than Laugherty. Whether the one lot or both lots were intended to be sold, the Sheriff has conveyed to Laugherty the *whole* of the land formerly occupied by Kearny, and Allison, under his derivation of title from Laugherty, has taken possession and claims the whole 207 acres, less one acre.

What relief can a Court of Equity afford, or what should be the extent of the relief that should be afforded? This is the most difficult question in the case. In the case of individual sales, when an excessive surplus is embraced in the deed, a Court of Equity will take jurisdiction on the ground of mistake, and will coerce a surrender of the surplus to the vendor, or compel the vendee to pay a rateable amount per acre, for the same, with the amount paid for the original purchase, if there has been no fraud. But if there has been fraud on the part of the vendee, in procuring the excessive surplus in the deed, or on the part of the vendor, in effecting the sale with an excessive deficiency, a Court of Equity may set aside the whole contract. And even in cases where the excess of surplus, or deficiency, has occurred through mistake only, an entire rescission will be decreed, when such a decree may be necessary to do full and complete justice between the parties. To allow the defendants to pay for the surplus, or to allot the surplus to the complainants in the case under consideration, would be to give sanction to the illegal and unauthorized sale, and in case the former remedy be afforded, to compel the complainants, or their lunatic ancestor, for money, to part with more of his land than was necessary to pay the executions and costs, and at a price at which the residue was sold and sacrificed, without and against his or their will or concurrence; and the uncertainty in the description and location of the 139 acres, the only defined quantity sold, renders it impracticable for the Court, with any certainty, to designate and allot the surplus to the complainants, as the place or location of the 139 acres, sold or intended to be sold, cannot, with any reasonable certainty, be ascertained, even

if the injurious effect of the uncertainty in the parcel sold could be disregarded. There are about one hundred and sixty acres of the two lots lying on the north side of the north fork of Goose Creek, if it be conceded that the 139 acres should be laid off· on that side of the creek, from what side or end shall it be taken? If the reserved acre could be located, (to the undefined position of which we have alluded,) shall the 139 acres be laid down adjoining it or on the opposite side of the tract? Or shall the surplus be laid off on the north-western end or on the opposite side? No data is furnished to enable us to determine, with even reasonably certainty, where the land sold was to lie. To give location to it we would have to deal in conjecture, or supply the uncertainty in the description by adding to the terms of sale. This we do not feel at liberty to do, and especially when the effect would be to carry out, sustain, and give effect to an irregular and illegal sale of a lunatic's real estate, which has been sold at an enormous sacrifice. Upon the whole, we think that the Chancellor's decree, rescinding the whole contract of sale, was proper and ought to be sustained.

But we think that there is error to the prejudice of the complainants below, in so much of the decree as requires them to refund the consideration and interest, without *any deduction* for rents. As Allison came into the possession under a judicial sale, and color of legal right, and after a recovery in ejectment, prosecuted against the tenants of Taylor, he ought not to be chargable with the full value of the rents. Though upon the legal presumption of his knowing the law, he has been equitably subjected to the consequences growing out of the uncertainty and irregularity of the sale, yet he in fact may not have known of them, but on the contrary, have believed that all the steps were legal, regular, and proper; and he had grounds to be strengthened in this opinion, from the fact that the sale was made by an officer of the law, who might be presumed to have done his duty, as well as from the fact that he had successfully prosecuted an ejectment, and been let into the possession under the judgment of a legal tribunal.

ALLISON
*vs*
TAYLOR'S H'S &c.

–On the payment of the purchase money and interest, less by the rents, during the time possession was held by the purchaser, and compensation for ameliorations.

But while we do not deem it equitable, under the circumstances of this case, to charge him with full rents, especially in behalf of complainants who are seeking equitable relief, as such, yet we do not think that they should be chargeable with interest during the time that he held the possession: but that the one should be set off against the other during the period of the defendant's occupancy.

It is therefore decreed, that the decree, upon the appeal of Allison, be affirmed, and that upon the cross errors assigned, so much of the decree be reversed as requires the complainants below to refund interest during the period that Allison, by himself or tenants, held possession of the land in controversy, or rather, that the interest upon the amount of the sales may be estimated against the complainants only down to the time that Allison was let into the possession; and the cause is remanded that the decree may be corrected as herein directed; and the appellant should pay the costs in this Court, of his appeal, and the costs, upon the cross errors, should be divided.

It being suggested by the counsel of Allison, since the foregoing opinion was delivered, that he has, since he was let into possession and during the pendency of this suit, made valuable improvements on the land, whereby he has increased its value, and if this be the case, believing as we do, that he, as a *bona fide* occupant, should be compensated for the same, we do order and direct, as a modification of the former mandate herein, that upon the return of the cause, the Chancellor will appoint Commissioners, who shall go upon the land in contest, and ascertain and make an estimate of the actual ameliorations, if any, whereby the land has been increased in value, and also of the rents and waste, if any, and after deducting the waste from the improvements, estimated as aforesaid, that the balance of the ameliorations be deducted from the rents, and the residue of the rents, if any, be set off against the interest which accrued during the occupancy, so far as the same will go, but not to be allowed to exceed the interest thus accruing: but if the ameliorations shall exceed the rents, then that the complainants be decreed

to refund to Allison the excess, together with the consideration of the purchase and interest.

*Pirtle* for Allison, &c.: *Guthrie and Loughborough* for Taylor's heirs.